# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                              No. CR 00-1066 LH

JESUS RAUL BEJARANO-RAMIREZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court for hearing on November 2, 2000, on Defendant's Motion to Suppress Evidence (Docket No.18), filed September 29, 2000.  The Court, having considered the pleadings submitted by the parties, the arguments of counsel, the testimony of witnesses, the police videotape of the traffic stop and otherwise being fully advised, finds that the motion is well taken and shall be **granted.**

Defendant filed a motion to suppress evidence that was found when New Mexico State Police detained him and searched the car he was driving on July 8, 2000.[1]  The Court has viewed the videotape of the traffic stop which was recorded by the video camera in the New Mexico State Police patrol car.  *See* Gov't's Ex. 1.  On November 2, 2000, the Court heard arguments on the motion and

---

[1]The videotape of the traffic stop taken from the patrol car indicates the date as being July 4, 2000.  However, both parties' briefs state that the traffic stop occurred on July 8, 2000.

testimony from three witnesses.  Those witnesses were Doug Looney, the New Mexico State Trooper that conducted the traffic stop, Sam Candelaria, an investigator with the Albuquerque Police Department assigned to the DEA Task Force, and Defendant Jesus Bejarano.

**Statement of Facts**

On or about July 8, 2000, Defendant was driving a car northbound on Interstate 25 (I-25) in northern New Mexico.  At about 10:39 p.m. New Mexico State Police Officer Doug Looney was traveling southbound on I-25, observed the car driven by Defendant at an apparently high rate of speed, and turned on the radar unit in the patrol car.  The radar unit indicated that the car driven by Defendant was traveling at a speed of 96 miles per hour.  Officer Looney then turned the patrol car around, turned on its flashing lights, and began to pursue the car driven by Defendant (hereinafter referred to as "the car").[2]  Officer Looney testified that the brake lights on the car came on immediately after the patrol car's flashing lights were turned on.  Officer Looney further testified that Defendant pulled off the road and stopped within seconds.  The stop was within the city limits of Raton, NM.

After calling in the license plate number of the car, Officer Looney approached the passenger side of the car.  According to Officer Looney, there was loud music blaring from the car but no music can be heard on the videotape because the officer's microphone was apparently turned off.[3]  About 30 seconds after the car stopped, the officer approached the car and knocked on the passenger side

---

[2]The car that was driven by Defendant is not referred to as "Defendant's car" because there is some question as to its ownership.  The only other vehicles described in this opinion are specifically identified as "patrol car" or "tow truck."

[3]The audio portion of the videotape was recorded by a microphone worn by the officer which he can turn on and off.  The microphone was turned off for a substantial portion of the videotape.  The officer testified that he turned the microphone off to conserve the battery.

door.  Another 15 seconds later, Defendant gave the officer the registration certificate for the car.

Officer Looney turned on the microphone about a minute and a half after stopping Defendant.

Defendant allegedly told the officer he had a Texas driver's license but did not have it with him.

Defendant told Officer Looney that he was traveling to Denver to visit friends.  Officer Looney asked

Defendant for his friends' names.  Defendant answered in less than two seconds.  After obtaining

Defendant's name and date of birth, Officer Looney returned to the patrol car and radioed the

information to the dispatcher for a computer check.  Approximately seven minutes after stopping

Defendant, Officer Looney asked Defendant to get out of the car while he prepared a citation for

speeding.  Officer Looney explained to Defendant the options regarding payment of the fine.

Defendant signed the citation about 10 minutes after being stopped.  Nothing on the videotape during

the first 10 minutes of the traffic stop suggests that Defendant is nervous.

After Defendant signed the citation, Officer Looney handed the citation to Defendant and said

"If you don't mind, I have a few other questions for you."   Officer Looney then asked Defendant

about the ownership of the car and whether he had large amounts of cash, drugs, marijuana, cocaine

or methamphetamine.  Defendant indicated that the car belonged to his cousin and that he did not

have a large amount of cash or any drugs.  Officer Looney then asked Defendant "Would you have

a problem if I looked in there?" and "You don't have a problem if I check the vehicle then?"

Defendant consented to a vehicle search.  Officer Looney patted down Defendant to check for

weapons, instructed Defendant to stand away from the car, and began a search of the car.

A second trooper arrived at 10:55 p.m.  Officer Looney told the second trooper that

Defendant was nervous and hesitated in telling Officer Looney his friends' names.[4]  At 10:59 p.m.,

---

[4]On the videotape, Defendant can be heard responding to the officer in less than two seconds.

Officer Looney inspected the fuel tank and noted that it had been altered.  At 11:05 p.m., an officer patted down Defendant to find out whether he was carrying a wallet.  The officer found and examined the contents from Defendant's pocket, including a passport.  In response to Officer Looney's questions, Defendant indicated that he did not know if the vehicle had been in an accident or why the gas tank might have been worked on.  A third officer arrived at this time.

At 11:13 p.m., about 34 minutes after Defendant was stopped, Officer Looney informed Defendant that he had reason to believe that the fuel tank had been tampered with and that he had a drug dog  coming to inspect the vehicle.  Officer Looney asked Defendant if he had a problem with that.  Officer Looney testified that Defendant consented to a dog sniff.  Defendant's answer is inaudible on the videotape.  Officer Looney informed Defendant that the dog sniff should only take a few minutes.

At 11:20 p.m. and again at 11:24 p.m.,  41 and 45 minutes after he was stopped, Defendant asked Officer Looney "How much longer is this going to take?"  Both times Officer Looney told Defendant he wanted the drug dog to check the gas tank.  Officer Looney continued to question Defendant about when he left El Paso.

At 11:41 p.m., one hour and 2 minutes after stopping Defendant, Officer Looney radioed in a request for a border crossing check on the car.  At 11:45 p.m., Officer Looney told Defendant to "go up by your vehicle and I'll make a few more calls and if everything comes out okay, I'll just get you on your way."  A couple of minutes before midnight, Officer Looney told Defendant that the border people said that Defendant and the car crossed the border between Mexico and the United States the previous night.  Officer Looney questioned Defendant about crossing the border.

Initially, Officer Looney expected the Raton police officer with the drug dog to respond within a few minutes because Officer Looney had stopped Defendant within the Raton city limits. Later, Officer Looney informed Defendant that it was going to be a little bit longer for the drug dog to arrive because the dog and his handler were working at an accident. At 11:42 p.m., a radio call came in indicating that it was going to be a while longer because the Raton police officer and drug dog were responding to a burglary.

The dog arrived at the traffic stop at 12:09 a.m., an hour and a half after Officer Looney stopped Defendant. Officer Looney asked Defendant if it would be okay to run the dog over the car. Defendant consented. Defendant was questioned about whether there is anything in the car. Defendant stated he did not know if there was anything in the vehicle. Five minutes later the dog began searching the car. The five minute search ended an hour and 40 minutes after the traffic stop. Officer Looney asked Defendant if he had any problem with them taking the fuel tank off and produced a consent form. At 12:27 a.m. Defendant refused to sign the consent form. The police performed an inventory of the car's contents. An officer gave Defendant a ride to a 24-hour restaurant in Raton, and at 12:53 a.m., a tow truck towed the car to the New Mexico State Police Office in Raton. Officer Looney searched the car and found several bundles of a substance alleged to be cocaine. Defendant was then arrested.

**Defendant Has Standing to Challenge the Search**

The United States asserts that Defendant lacks standing to challenge the search of the car because he did not own the car. In determining whether a search violated the Fourth Amendment rights of Defendant, the Court considers two factors: whether Defendant has manifested a subjective expectation of privacy in the area searched and whether that expectation is one society would

recognize as objectively reasonable. *United States v. Betancur*, 24 F.3d 73, 76 (10th Cir. 1994). Defendant need not produce legal documentation showing a chain of lawful custody from the registered owner to himself but he must at least state that he gained possession from the owner or someone with the authority to grant possession. *United States v. Rubio-Rivera*, 917 F.2d 1271, 1275 (10th Cir. 1990).

Defendant stated that he borrowed the car from the registered owner. Mr. Samuel Candelaria, who is employed by the Albuquerque Police Department and is also on a task force with the Drug Enforcement Agency, testified that the registered owner said he had lent the car to Defendant. *See also* Def.'s Ex. E. Mr. Candelaria also testified that the registered owner later stated that the car was not his but instead belonged to Defendant. In either case, Defendant had lawful possession of the car and a reasonable expectation of privacy in the vehicle. Consequently, Defendant has standing to challenge the search of the vehicle.

## Brief Detention of Car Justified

An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. *United States v. Sandoval*, 29 F.3d 537, 539 (10th Cir. 1994)(citations omitted). After producing a valid license and proof that he is entitled to operate the car, the driver must be allowed to proceed on his way, without being subject to further delay by police for additional questioning. *Id.* at 540. Further questioning and detention are permissible when (1) during the course of the of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity, or (2) the driver voluntarily consents to the officer's additional questioning. *Id.* If neither of these factors is present,

evidence derived from further questioning or from an ensuing search is impermissibly tainted in Fourth Amendment terms. *Id.*

Here, Officer Looney conducted a routine traffic stop and issued Defendant a citation for speeding. After issuing the citation, Officer Looney indicated that he had a few other questions which Defendant voluntarily answered. Officer Looney also asked to search the car and Defendant consented. At this point in the traffic stop, nothing suggests to the Court that Officer Looney's conduct would have communicated to a reasonable person that the person was not free to decline the officer's request or otherwise terminate the encounter. *See United States v. Elliot*, 107 F.3d 810, 813 (10th Cir. 1997)(court must focus on the totality of the circumstances in a particular case to determine whether a driver and police officer are engaged in a consensual encounter). Officer Looney and Defendant were engaged in a consensual encounter.

Officer Looney's search of the car provided articulable facts which gave him reasonable suspicion that Defendant was engaged in illegal activity. Facts which describe a very large category of presumably innocent travelers cannot by themselves support reasonable suspicion, but rather, must be coupled with evidence about the particular conduct of the person which gives rise to a suspicion of that individual's involvement in criminal activity. *United States v. Cortez*, 448 U.S. 438, 441 (1979). Considering only those observations made by Officer Looney during the consensual encounter, I find that the facts in this case are sufficient to support reasonable suspicion of Defendant's involvement in illegal activity. Those facts include: (1) the gas tank appeared to have been altered, (2) one of the tires had new balancing weights and did not match the other three tires on the car, (3) the dashboard appeared to have been altered , and (4) Defendant was traveling from El Paso, a known source city for drugs, to Denver on I-25, a known drug trafficking route.

Under the circumstances in this case, Officer Looney was justified in briefly detaining the car in order to further investigate through the use of a narcotics detecting dog. Furthermore, Officer Looney asked for, and obtained, Defendant's consent to have a drug dog inspect the car.

**Length of Detention of the Car was Unreasonable**

An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id.* (It is the state's burden to demonstrate that the seizure was sufficiently limited in duration to satisfy the conditions of an investigative seizure). Although it has declined to adopt an outside time limit for a permissible *Terry* stop, the Supreme Court in *Place* held that the length of detention [90 minutes] of a respondent's luggage *by itself* was sufficient to render a seizure unreasonable in the absence of probable cause. *United States v. Place*, 462 U.S. 696, 709 (1983). In assessing the effect of the length of a detention, the Court takes into account whether the police diligently pursue their investigation to minimize the intrusion on a person's Fourth Amendment interests. *Id.* (seizure lasted 90 minutes because of lack of diligence on the part of the police who knew when respondent was arriving at the airport but failed to arrange for a drug dog to meet respondent upon his arrival); *but see United States v. Frost*, 999 F.2d 737, 742 (3rd Cir. 1993)(80 minute delay between seizure and dog sniff of luggage not unreasonable where a drug sniffing dog was not on duty at airport and it took another dog nearly an hour to reach the airport after being summoned at six o'clock in the evening).

Although a brief investigatory detention of the car was proper, the nearly hour and a half delay prior to the dog sniff was not justified. Officer Looney's detention of the car began at 10:50 p.m.

after he issued a citation to Defendant. The dog sniff did not occur until 12:14 a.m., approximately 84 minutes after the detention of the car began. The detention in this case was only six minutes less than the 90 minute detention which was held unreasonable in *Place*.

Furthermore, the officer with the drug dog did not proceed directly to the traffic stop after Officer Looney requested the dog sniff. Instead, the officer with the dog responded to a burglary after responding to an accident. No attempt was made to arrange for another officer to respond to the burglary in place of the officer with the drug dog. Consequently, I cannot conclude that all of the officers involved in this case diligently pursued the investigation of the car to minimize the intrusion on Defendant's Fourth Amendment interests. "Diligent" means attentive and persistent in doing a thing; steadily applied; unremitting. BLACK'S LAW DICTIONARY 457 (6th ed. 1990).

The United States argues that length of detention was reasonable and that the investigation was diligently pursued. The basis of the government's argument is that the delay in the drug dog's arrival was due to the fact that the drug dog and its handler responded to two calls before arriving at the traffic stop. However, even if the officers were perfectly diligent, a seizure without probable cause could still last too long to pass muster under the Fourth Amendment. *United States v. Moore*, 22 F.3d 241, 248 (10th Cir. 1994)(quoting *United States v. Morgan*, 16 F.3d 1051, 1060 (9th Cir. 1994)).

> For example, if an unforeseeable canine virus suddenly afflicted all of the drug-sniffing dogs in Hawaii, leaving them out of commission for a 24-hour period, government agents in Hawaii would not be justified in detaining a traveller's [sic] bags for the entire period on a mere reasonable suspicion. Regardless of the government's good faith and exercise of due care, the Fourth Amendment would not allow such an extensive impingement of the traveller's [sic] liberty without probable cause.

> *Id.*

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Suppress Evidence (Docket No.18), filed September 29, 2000, is **granted.**

**UNITED STATES DISTRICT JUDGE**